## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| MARK COURSEY, individually and on behalf of all others similarly situated, | Case No. |
| Plaintiff, | |
| v. | CLASS ACTION |
| MIDWEST CENTER FOR DERMATOLOGY & PATHOLOGY, PLLC, and DERMATOLOGISTS OF CENTRAL STATES, LLC d/b/a DOCS DERMATOLOGY GROUP, | JURY TRIAL DEMANDED |
| Defendants. | |

## <u>CLASS ACTION COMPLAINT</u>

Plaintiff Mark Coursey ("Plaintiff"), individually and on behalf of all others similarly situated (collectively, "Class members"), by and through undersigned counsel, brings this Class Action Complaint against Defendants Midwest Center for Dermatology & Pathology PLLC, and Dermatologists of Central States, LLC d/b/a DOCS Dermatology Group (collectively, "Defendants"), and complains and alleges upon personal knowledge as to himself and information and belief as to all other matters.

## <u>INTRODUCTION</u>

1.     This class action arises from Defendants' failure to implement and maintain reasonable data security procedures and practices, resulting in a data breach

1

in or around December 2025 (the "Data Breach") in which unauthorized third parties accessed and/or exfiltrated Plaintiff's and Class Members' highly sensitive personal information, including but not limited to: names, addresses, dates of birth, Social Security numbers, patient and/or medical record numbers, health insurance information, clinical and diagnostic information related to dermatology treatment and pathology services, and other personal and medical information defined as "personal information," "medical information," and/or "protected health information" under applicable federal and state law (collectively, "PII/PHI" or "Personal Information").

2.     Defendant Midwest Center for Dermatology & Pathology, PLLC ("Midwest Center") is a multi-location medical practice providing medical, surgical, and cosmetic dermatology services in multiple locations in Southeast Michigan.[1] Midwest Center's website describes it as offering "expert medical, surgical, and aesthetic care from head to toe," and lists treatment of common dermatologic conditions (e.g., acne, eczema, psoriasis, skin cancers) as well as cosmetic procedures (e.g., Botox and fillers, laser treatments, CoolSculpting, microneedling) and participation in clinical trials through a skin care research center.[2]

---

[1] *See* Midwest Center for Dermatology & Cosmetic Surgery, https://mwdermatology.com (last visited Dec. 10, 2025).
[2] *Id.*

3.     Midwest Center is an affiliate of Defendant Dermatologists of Central States, LLC d/b/a DOCS Dermatology Group ("DOCS"), which operates more than 85 dermatology locations and over 190 providers across multiple states, including Michigan. DOCS lists Midwest Center among its Michigan affiliate practices and centralizes certain patient-facing functions such as online bill pay, forms, and portal access.[3]

4.     Defendants' failures to ensure that their servers and systems were adequately secure jeopardized the security of Plaintiff's and Class Members' Personal Information, and exposed Plaintiff and Class Members to fraud and identity theft or the serious risk of fraud and identity theft.

5.     As a result of Defendants' conduct and the resulting Data Breach, Plaintiff and Class Members' privacy has been invaded, their Personal Information is now in the hands of criminals, and they now face an imminent and ongoing risk of identity theft and fraud. Accordingly, these individuals now must take immediate and time-consuming action to protect themselves from such identity theft and fraud.

---

[3] *See* Midwest Center for Dermatology & Cosmetic Surgery, *Our Medical Practice,* https://mwdermatology.com/our-medical-practice (last visited Dec. 10, 2025) and DOCS Dermatology Group, https://docsdermgroup.com (last visited Dec. 10, 2025).

## PARTIES

### *Plaintiff*

6.      Plaintiff Mark Coursey is a Michigan resident who has paid for and received medical treatment and services numerous times at Midwest Center. Believing Defendants would implement and maintain reasonable security practices to protect his PII/PHI, Plaintiff routinely provided his PII/PHI to Defendants in connection with receiving medical treatment and services. As a result of Defendants' conduct, Plaintiff suffered actual damages including, without limitation, incurring time and expenses related to monitoring his financial accounts for fraudulent activity, facing an increased and imminent risk of fraud and identity theft, the lost value of his personal information, and other economic and non-economic harm. Plaintiff will now be forced to expend additional time to review his credit reports and monitor his financial accounts and medical records for fraud or identity theft.

### *Defendants*

7.      Defendant Midwest Center for Dermatology & Pathology, PLLC ("Midwest Center") is a Michigan professional limited liability company that provides medical, surgical, and cosmetic dermatology services to patients throughout Southeast Michigan, including in Clinton Township, Warren, Farmington Hills, Shelby Township, and St. Clair Shores. Midwest Center lists its registered agent address as 40600 Ann Arbor Road East, Suite 201, Plymouth,

Michigan 48170. Midwest Center is an affiliate of DOCS, LLC d/b/a DOCS Dermatology Group, which operates a multi-state network of dermatology practices.[4]

8.      Defendant Dermatologists of Central States, LLC d/b/a DOCS Dermatology Group ("DOCS") is an Ohio limited liability company that operates a multi-state network of dermatology practices and provides medical, cosmetic, and other services through its affiliated clinics. DOCS owns, operates, controls, or manages Midwest Center and publishes the privacy policies applicable to Midwest Center patients.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(a) and (d), because the matter in controversy, exclusive of interest and costs, exceeds the sum or value of five million dollars ($5,000,000.00), there are in excess of 100 Class Members, the action is a class action in which one or more Class Members are citizens of states different from Defendants.

10.     The Court has personal jurisdiction over Defendants because they conduct substantial business in Michigan, operate in Michigan, and otherwise have

---

[4] Midwest Center for Dermatology & Cosmetic Surgery, *Our Medical Practice*, https://mwdermatology.com/our-medical-practice (last visited Dec. 10, 2025).

sufficient minimum contacts with and intentionally avail themselves of the markets in Michigan.

11.    Venue properly lies in this judicial district because, *inter alia,* Defendants transact substantial business, have agents, and are otherwise located in this district; and a substantial part of the conduct giving rise to Plaintiff's claims occurred in this judicial district.

## FACTUAL ALLEGATIONS

### *Defendants Collect and Store Personal Information*

12.    Defendants operate multiple dermatology and pathology offices in Clinton Township, Warren, Farmington Hills, Shelby Township, and St. Clair Shores, Michigan.[5] On information and belief, Defendants employ dozens of dermatologists, advanced practice providers, and support staff and conduct thousands of patient visits each year, generating substantial revenue from the diagnosis and treatment of skin diseases, dermatologic surgeries, cosmetic procedures, and related pathology and research services.

13.    In the regular course of business, Defendants routinely collect, store, and maintain, highly sensitive personal information, including protected health

---

[5] *See* Midwest Center for Dermatology & Cosmetic Surgery, *Our Medical Practice,* https://mwdermatology.com/our-medical-practice (last visited Dec. 10, 2025); DOCS Dermatology Group, *About Us*, https://docsdermgroup.com/about-us (last visited Dec. 10, 2025).

information ("PHI") and personally identifiable information ("PII") from patients, clients, and other individuals in relation to providing medical, surgical, and cosmetic services.

14.    Defendants, through their own websites, make available a Privacy Statement which explains that Defendants "are committed to respecting and protecting your privacy" and that they collect Personal Information "such as email addresses, first and last names, dates of birth, IP addresses, browser-shared geolocation date, address and zip code information, and other information … to ensure quality content, personalize and improve" their services.[6] The Privacy Statement also represents that Defendants "implement[] a variety of security measures to maintain the safety of your Personal Information."[7]

15.    Defendants require patients, clients, and other individuals to provide sensitive Personal Information before they provide medical, surgical, and cosmetic services. Upon information and belief, that information also includes, *inter alia*, highly sensitive PII such as full name, address, phone number, date of birth, email, government identifiers and financial/billing data: insurance policy numbers, group numbers, subscriber information, billing and claims data, Social Security numbers

---

[6] DOCS Dermatology Group, *Privacy Statement*, https://docsdermgroup.com/privacy-statement (effective June 11, 2020) (last visited Dec. 10, 2025).
[7] *Id.*

and payment card details, protected health information (PHI), diagnostic and treatment information for dermatologic conditions and skin cancers, pathology results, biopsy reports, photographs of lesions, prescriptions, allergy history, comorbidities, and visit notes, and clinical trial / research data: health history, response to investigational products, and other study-related record. Defendants store this information digitally.

16.    The Notice of Privacy Practices applicable to Defendants describe "how medical information about you may be used and disclosed" and provides, in part:

> **How do we typically use or share your health information?**
> We may use and disclose your health information for different purposes including treatment, payment, and health care operations. Some sensitive information, such as HIV-related information, genetic information, substance abuse records, and mental health records may be entitled to special confidentiality protections under applicable state or federal law. We will abide by these special protections as they pertain to sensitive information in your health records.[8]

17.    Defendants are and were aware of the sensitive nature of the Personal Information they collect, and they acknowledge the importance of data privacy. For example, the Notice of Privacy Practices states that Defendants are required by law

---

[8] DOCS Dermatology Group, *Notice of Privacy Practices*, https://docsdermgroup.com/notice-of-privacy-practices.pdf (effective Feb. 7, 2023) (last visited Dec. 10, 2025).

to maintain the privacy of PHI and explains permitted uses and disclosures for treatment, payment, and healthcare operations:

> **Our Responsibilities**
> - We are required by law to maintain the privacy and security of your protected health information.
> - We will let you know promptly if a breach occurs that may have compromised the privacy or security of your information.
> - We must follow the duties and privacy practices described in this notice and give you a copy of it.
> - We will not use or share your information other than as described here unless you tell us we can in writing. If you tell us we can, you may change your mind at any time. Let us know in writing if you change your mind.[9]

18.    The Privacy Statement and Notice of Privacy Practices make clear that Defendants were aware of the need to safeguard the sensitive Personal Information entrusted to them.

19.    Plaintiff and Class members are, or were, patients, clients, or otherwise affiliated with Defendants, and/or services from Defendants, and entrusted Defendants with their Personal Information.

20.    Plaintiff and Class members, as former and current patients, clients, or persons otherwise affiliated with Defendants, relied on these promises and on these well-established healthcare entities to keep their sensitive Personal Information confidential and securely maintained, to use this information for business purposes only, and to make certain only authorized disclosure of this information.

---

[9] *Id.*

9

### *The Data Breach*

21.     On or around December 9, 2025, a threat actor claimed to have breached Defendants' systems, gaining access to Plaintiff's and Class members' sensitive Personal Information.

22.     A sophisticated ransomware group known as Qilin asserted on its leak site that it exfiltrated sensitive data from Defendants and threatened to publish or sell the information unless a ransom was paid—an approach consistent with Qilin's established "double-extortion" model, in which the group both encrypts victim systems and releases stolen data to coerce payment:[10][11]



23.     Given Qilin's demonstrated targeting of healthcare and other critical-

---

[10] *Id.*

[11] Qilin Ransomware Group, Leak Site Posting Regarding Midwest Center for Dermatology (Tor-hidden service URL on file with Plaintiff) (accessed Dec. 10, 2025).

service providers, and its repeated use of data-theft extortion tactics, its claims create a significant and credible risk that protected health information and other confidential data associated with Midwest Center were compromised.[12]

24.    As of December 10, 2025, Defendants have made no public acknowledgement of the Data Breach.

25.    Defendants did not use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiff and Class members, causing the exposure of PII/PHI, such as encrypting the information or deleting it when it is no longer needed.

26.    Upon information and belief, Plaintiff's and Class members' PII/PHI was compromised and acquired in the Data Breach.

27.    As evidenced by the Data Breach's occurrence, the PII/PHI contained in Defendants' system was not adequately protected from intrusions. Had the information been properly secured consistent with industry standard and best practices, the data thieves would have exfiltrated only unintelligible data.

28.    The ransomware group accessed and acquired files in Defendants' systems containing PII/PHI of Plaintiff and Class Members. Upon information and belief, such compromised information includes, *inter* alia, names, addresses, dates of birth, Social Security numbers, patient and/or medical record numbers, health

---

[12] Center for Internet Security, *supra* at n.8.

insurance information, clinical and diagnostic information related to dermatology treatment and pathology services, and other highly sensitive PII/PHI. As a result, Plaintiff's and Class members' PII/PHI was accessed and stolen in the Data Breach, and their privacy has been jeopardized.

29.     Plaintiff further believes that his PII/PHI, and that of Class members, was subsequently published or sold on the dark web following the Data Breach, as Qilin explicitly threatened to do so, and that is the *modus operandi* of cybercriminals that commit cyber-attacks of this type.

### *Defendants Knew That Criminals Target PII/PHI*

30.     At all relevant times, Defendants knew, or should have known, its patients', clients' and other affiliated individuals', Plaintiff's, and all other Class members' PII/PHI was a target for malicious actors. Despite such knowledge, Defendants failed to implement and maintain reasonable and appropriate data privacy and security measures to protect Plaintiff's and Class members' PII/PHI from cyber-attacks that Defendants should have anticipated and guarded against.

31.     It is well known amongst companies that store sensitive personally identifying information that sensitive information—such as Social Security numbers ("SSNs") and medical information—is valuable and frequently targeted by criminals. Indeed, "[d]ata breaches are on the rise for all kinds of businesses,

including retailers . . . . Many of them were caused by flaws in . . . systems either online or in stores."[13]

32.    Cyber criminals seek out PHI at a greater rate than other sources of personal information. In a 2021 report, the healthcare compliance company Protenus found that there were 758 medical data breaches in 2020 with over 40 million patient records exposed.[14] This is an increase from the 572 medical data breaches that Protenus compiled in 2019.[15]

33.    PII/PHI is a valuable property right.[16] The value of PII/PHI as a commodity is measurable.[17] "Firms are now able to attain significant market valuations by employing business models predicated on the successful use of

[13]    Dennis Green, Mary Hanbury & Aine Cain, *If you bought anything from these 19 companies recently, your data may have been stolen*, BUSINESS INSIDER (Nov. 19, 2019, 8:05 AM), https://www.businessinsider.com/data-breaches-retailers-consumer-companies-2019-1.

[14]    Protenus, *2021 Breach Barometer*, PROTENUS.COM, available at https://www.protenus.com/resources/2021-breach-barometer (last accessed Oct. 5, 2023).

[15]    Protenus, *2020 Breach Barometer*, PROTENUS.COM, available at https://www.protenus.com/resources/2020-breach-barometer (last accessed Oct. 5, 2023).

[16]    *See* Marc van Lieshout, *The Value of Personal Data*, 457 International Federation for Information Processing 26 (May 2015) ("The value of [personal] information is well understood by marketers who try to collect as much data about personal conducts and preferences as possible…"), https://www.researchgate.net/publication/283668023_The_Value_of_Personal_Data.

[17]    *See* Robert Lowes, *Stolen EHR [Electronic Health Record] Charts Sell for $50 Each on Black Market*, MEDSCAPE.COM (April 28, 2014), http://www.medscape.com/viewarticle/824192.

personal data within the existing legal and regulatory frameworks."[18] American companies spend many billions of dollars on acquiring personal data of consumers.[19] It is so valuable to identity thieves that once PII/PHI has been disclosed, criminals often trade it on the "cyber black-market," or the "dark web," for many years.

34.     As a result of their real and significant value, identity thieves and other cyber criminals have openly posted credit card numbers, SSNs, PII/PHI, and other sensitive information directly on various Internet websites making the information publicly available. This information from various breaches, including the information exposed in the Data Breach, can be readily aggregated and become more valuable to thieves and more damaging to victims.

35.     PHI is particularly valuable and has been referred to as a "treasure trove for criminals."[20] A cybercriminal who steals a person's PHI can end up with as many

---

[18]   OECD, *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD LIBRARY (April 2, 2013), https://www.oecd-ilibrary.org/science-and-technology/exploring-the-economics-of-personal-data_5k486qtxldmq-en (last accessed Oct. 5, 2023).

[19]   IAB Data Center of Excellence, *U.S. Firms to Spend Nearly $19.2 Billion on Third-Party Audience Data and Data-Use Solutions in 2018, Up 17.5% from 2017*, IAB.COM (Dec. 5, 2018), https://www.iab.com/news/2018-state-of-data-report/ (last accessed Oct. 5, 2023) (estimated to have spent over $19 billion in 2018).

[20]   *See* Andrew Steager, *What Happens to Stolen Healthcare Data*, HEALTHTECH MAGAZINE (Oct. 20, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon ("*What Happens to Stolen Healthcare Data* Article") (quoting Tom Kellermann, Chief Cybersecurity Officer, Carbon Black, stating "Health information is a treasure trove for criminals.").

as "seven to ten personal identifying characteristics of an individual."[21] A study by Experian found that the "average total cost" of medical identity theft is "about $20,000" per incident, and that a majority of victims of medical identity theft were forced to pay out-of-pocket costs for healthcare they did not receive in order to restore coverage.[22]

36.     All-inclusive health insurance dossiers containing sensitive health insurance information, names, addresses, telephone numbers, email addresses, SSNs, and bank account information, complete with account and routing numbers, can fetch up to $1,200 to $1,300 each on the black market.[23] According to a report released by the Federal Bureau of Investigation's ("FBI") Cyber Division, criminals can sell healthcare records for 50 times the price of a stolen Social Security or credit card number.[24]

---

[21]   *Id.*

[22]   *See* Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET (Mar. 3, 2010), https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims.

[23]   SC Staff, *Health Insurance Credentials Fetch High Prices in the Online Black Market*, SC MAGAZINE (July 16, 2013), https://www.scmagazine.com/news/breach/health-insurance-credentials-fetch-high-prices-in-the-online-black-market (last accessed Oct. 5, 2023).

[24]   Federal Bureau of Investigation, *Health Care Systems and Medical Devices at Risk for Increased Cyber Intrusions for Financial Gain* (April 8, 2014), https://www.illuminweb.com/wp-content/uploads/ill-mo-uploads/103/2418/health-systems-cyber-intrusions.pdf (last accessed Oct. 5, 2023).

37.     John Riggi, the American Hospital Association National Advisor for Cybersecurity and Risk, said "foreign cyber gangs and spies" were testing the resilience of hospitals especially as hospitals began to fill up at the time because of the "tripledemic" including increased cases of RSV, flu and COVID-19.[25]

38.     Criminals can use stolen PII/PHI to extort a financial payment by "leveraging details specific to a disease or terminal illness."[26] Quoting Carbon Black's Chief Cybersecurity Officer, one article explained: "Traditional criminals understand the power of coercion and extortion . . . By having healthcare information—specifically, regarding a sexually transmitted disease or terminal illness—that information can be used to extort or coerce someone to do what you want them to do."[27]

39.     Consumers place a high value on the privacy of that data. Researchers shed light on how much consumers value their data privacy—and the amount is considerable. Indeed, studies confirm that "when privacy information is made more

---

[25] Dan Alexander, *Personal Data of 617,000 Patients Exposed in NJ Hospital Cyberattack*, New Jersey 101.5 (Feb. 13, 2023), https://nj1015.com/personal-data-of-617000-patients-exposed-in-nj-hospital-cyberattack/.

[26]     *What Happens to Stolen Healthcare Data*, *supra* at n.23.

[27]     *Id.*

salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[28]

40.    Given these facts, any company that transacts business with a consumer and then compromises the privacy of consumers' PII/PHI has thus deprived that consumer of the full monetary value of the consumer's transaction with the company.

### Theft of PII/PHI Has Grave and Lasting Consequences for Victims

41.    Theft of PII/PHI is serious. The Federal Trade Commission ("FTC") warns consumers that identity thieves use PII/PHI to exhaust financial accounts, receive medical treatment, start new utility accounts, and incur charges and credit in a person's name.[29]

42.    Identity thieves use personal information for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.[30]

---

[28]    Janice Y. Tsai et al., *The Effect of Online Privacy Information on Purchasing Behavior, An Experimental Study*, 22(2) INFORMATION SYSTEMS RESEARCH 254 (June 2011), https://www.jstor.org/stable/23015560?seq=1.

[29]    *See* Federal Trade Commission, *What to Know About Identity Theft*, FEDERAL TRADE COMMISSION CONSUMER INFORMATION, https://www.consumer.ftc.gov/articles/what-know-about-identity-theft (last accessed Oct. 5, 2023).

[30]    The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 16 C.F.R. § 603.2. The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number,

According to Experian, one of the largest credit reporting companies in the world, "[t]he research shows that personal information is valuable to identity thieves, and if they can get access to it, they will use it" to among other things: open a new credit card or loan; change a billing address so the victim no longer receives bills; open new utilities; obtain a mobile phone; open a bank account and write bad checks; use a debit card number to withdraw funds; obtain a new driver's license or ID; use the victim's information in the event of arrest or court action.[31]

43. With access to an individual's PII/PHI, criminals can do more than just empty a victim's bank account—they can also commit all manner of fraud, including: obtaining a driver's license or official identification card in the victim's name but with the thief's picture; using the victim's name and SSN to obtain government benefits, or; filing a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's SSN, rent a house, or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest, resulting in an arrest warrant being

---

alien registration number, government passport number, employer or taxpayer identification number. *Id*.

[31] *See* Susan Henson, *What Can Identity Thieves Do with Your Personal Information and How Can You Protect Yourself*, EXPERIAN, https://www.experian.com/blogs/ask-experian/what-can-identity-thieves-do-with-your-personal-information-and-how-can-you-protect-yourself/.

issued in the victim's name.[32]

44.     Identity theft is a very difficult problem to solve. In a survey, the Identity Theft Resource Center found that most victims of identity crimes need more than a month to resolve issues stemming from identity theft and some need over a year.[33]

45.     Theft of SSNs also creates a particularly alarming situation for victims because those numbers cannot easily be replaced. To obtain a new SSN, a breach victim has to demonstrate ongoing harm from misuse of his SSN, and a new SSN will not be provided until after the harm has already been suffered by the victim.

46.     Due to the highly sensitive nature of SSNs, theft of SSNs in combination with other PII (e.g., name, address, date of birth) is akin to having a master key to the gates of fraudulent activity. TIME quotes data security researcher Tom Stickley, who is employed by companies to find flaws in their computer systems, as stating, "If I have your name and your Social Security number and you don't have a credit freeze yet, you're easy pickings."[34]

---

[32]   *See* Federal Trade Commission, *Warning Signs of Identity Theft*, IDENTITYTHEFT.GOV, https://www.identitytheft.gov/Warning-Signs-of-Identity-Theft (last accessed Oct. 5, 2023).

[33]   Identity Theft Resource Center, *2021 Consumer Aftermath Report*, IDENTITY THEFT RESOURCE CENTER (2021), https://www.idtheftcenter.org/identity-theft-aftermath-study/ (last accessed Oct. 5, 2023).

[34]   Patrick Lucas Austin, *'It Is Absurd.' Data Breaches Show it's Time to Rethink How We Use Social Security Numbers, Experts Say*, TIME (August 5, 2019),

47.     Theft of PII is even more serious when it includes theft of PHI. Data breaches involving medical information "typically leave[] a trail of falsified information in medical records that can plague victims' medical and financial lives for years."[35] It "is also more difficult to detect, taking almost twice as long as normal identity theft."[36] In warning consumers on the dangers of medical identity theft, the FTC states that an identity thief may use PII/PHI "to see a doctor, get prescription drugs, buy medical devices, submit claims with your insurance provider, or get other medical care." [37] The FTC also warns, "If the thief's health information is mixed with yours, your treatment, insurance and payment records, and credit report may be affected."[38]

48.     For these reasons, the information compromised in the Data Breach is significantly more valuable than the loss of basic financial information, because there, victims can cancel or close credit or debit card accounts. Upon information

---

https://time.com/5643643/capital-one-equifax-data-breach-social-security/.

[35]    Pam Dixon and John Emerson, *The Geography of Medical Identity Theft*, FTC.GOV (Dec. 12, 2017), https://www.ftc.gov/system/files/documents/public_comments/2018/01/00037-142815.pdf.

[36]    *See* Federal Bureau of Investigation, *Health Care Systems and Medical Devices at Risk…*, *supra* at n.27.

[37]    *See* Federal Trade Commission, *What to Know About Medical Identity Theft*, Federal Trade Commission Consumer Information, https://www.consumer.ftc.gov/articles/what-know-about-medical-identity-theft (last accessed Oct. 5, 2023).

[38]    *Id*.

and belief, the information compromised by the Data Breach—for example, a Social Security number—is exceedingly difficult, if not impossible, to change.

49.     A report published by the World Privacy Forum and presented at the US FTC Workshop on Informational Injury describes what medical identity theft victims may experience:

- Changes to their health care records, most often the addition of falsified information, through improper billing activity or activity by imposters. These changes can affect the healthcare a person receives if the errors are not caught and corrected.

- Significant bills for medical goods and services not sought nor received.

- Issues with insurance, co-pays, and insurance caps.

- Long-term credit problems based on problems with debt collectors reporting debt due to identity theft.

- Serious life consequences resulting from the crime; for example, victims have been falsely accused of being drug users based on falsified entries to their medical files; victims have had their children removed from them due to medical activities of the imposter; victims have been denied jobs due to incorrect information placed in their health files due to the crime.

- As a result of improper and/or fraudulent medical debt reporting, victims may not qualify for mortgage or other loans and may experience other financial impacts.

- Phantom medical debt collection based on medical billing or other identity information.

- Sales of medical debt arising from identity theft can perpetuate a victim's debt collection and credit problems, through no fault of their own.[39]

50.    There may also be a time lag between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. For example, on average, it takes approximately three months for consumers to discover their identity has been stolen and used, but it takes some individuals up to three years to learn that information.[40]

51.    It is within this context that Plaintiff and Class members must now live with the knowledge that their PII/PHI is forever in cyberspace and was taken by people willing to use the information for any number of improper purposes and scams, including making the information available for sale on the black-market.

### *Defendants Fail to Comply With Industry Standards*

52.    Cyber security experts routinely identify healthcare entities in possession of PII/PHI as being particularly vulnerable to cyberattacks because of the value of the information which they collect and maintain.

53.    As a result, several best practices have been identified that, at a minimum, should be implemented by healthcare entities in possession of PII/PHI,

---

[39]    *See The Geography of Medical Identity Theft*, *supra* at n.38.

[40]    John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 Journal of Systemics, Cybernetics and Informatics 9 (2019), http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf.

like Defendants, including but not limited to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software encryption, making data unreadable without a key; multi-factor authentication; backup data and limiting which employees can access sensitive data. Defendants failed to follow these industry best practices, including a failure to implement multi-factor authentication.

54.     Defendants failed to follow, enforce, or maintain the aforementioned best practices. Defendants also failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

### *Damages Sustained by Plaintiff and the Other Class Members*

55.     Plaintiff and Class members have suffered injury and damages, including, but not limited to: (i) a substantially increased risk of identity theft and medical theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their PII/PHI; (iii) breach of the confidentiality of their PII/PHI; (iv) deprivation of the value of

their PII/PHI, for which there is a well-established national and international market; and (v) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of identity theft and medical identity theft they face and will continue to face.

56.    Plaintiff had a reasonable expectation of privacy in his sensitive PII/PHI while receiving medical treatment and/or services. Plaintiff would not have agreed to have his sensitive PII/PHI provided to and maintained by Defendants had he known that Defendants would fail to adequately protect his PII/PHI. Indeed, Plaintiff sought medical treatment and/or services through Defendants with the reasonable expectation that Defendants would keep his PII/PHI secure and inaccessible to unauthorized parties. Plaintiff and Class members would not have obtained services from Defendants had they known that Defendants failed to properly train their employees, lacked safety controls over their computer network, and did not have proper data security practices to safeguard their PII/PHI from criminal theft and misuse.

57.    Plaintiff and all other Class members have suffered injury and damages, including, but not limited to: (i) a substantially increased risk of identity theft and medical theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their PII/PHI; (iii) breach of the confidentiality of their PII/PHI; (iv) deprivation of the value of

their PII/PHI, for which there is a well-established national and international market; and/or (v) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of identity theft and medical identity theft they face and will continue to face.

58.     As a result of Defendants' failures, Plaintiff and Class members are also at substantial and certainly impending increased risk of suffering identity theft and fraud or misuse of their PII/PHI. Indeed, Plaintiff's damages are not merely speculative. Consequently, Plaintiff and Class members now face a substantially increased risk of identity and medical theft that is plausibly imminent, considering the actual instances of fraud already suffered by other Class members.

## CLASS ALLEGATIONS

59.     This action is brought and may be properly maintained as a class action pursuant to Fed. R. Civ. P. 23.

60.     Plaintiff brings this action on behalf of himself and all members of the following Class of similarly situated persons:

**Nationwide Class**
All persons in the United States whose PHI/PII was accessed by and disclosed to unauthorized persons as a result of the Data Breach.

61.     Alternatively, Plaintiff seeks to certify this action on behalf of the following state class:

**Michigan Class**
All persons in the state of Michigan whose PHI/PII was accessed by and disclosed to unauthorized persons as a result of the Data Breach.

62.   Excluded from the Class are Defendants and their affiliates, parents, subsidiaries, officers, agents, and directors, as well as the judge(s) presiding over this matter and the clerks of said judge(s).

63.   Plaintiff reserves the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

64.   Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of the claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

65.   While the precise number of Class members has not yet been determined, the members in the Class are so numerous that joinder of all Class members in a single proceeding would be impracticable. Upon information and belief, the Data Breach affected tens of thousands of individuals who are geographically dispersed.

66.   Common questions of law and fact exist as to all Class members and predominate over any potential questions affecting only individual Class members. Such common questions of law or fact include, *inter alia*:

a. Whether Defendants had a duty to implement and maintain reasonable security procedures and practices to protect and secure Plaintiff's and Class members' PII/PHI from unauthorized access and disclosure;

b. Whether Defendants failed to exercise reasonable care to secure and safeguard Plaintiff's and Class members' PII/PHI;

c. Whether an implied contract existed between Class members and Defendants providing that Defendants would implement and maintain reasonable security measures to protect and secure Class members' PII/PHI from unauthorized access and disclosure;

d. Whether Defendants breached their duties to protect Plaintiff's and Class member's PII/PHI; and

e. Whether Plaintiff and Class members are entitled to damages and the measure of such damages and relief.

67. Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff, on behalf of himself and Class members. Individual questions, if any, pale in comparison, in both quantity and quality, to the numerous common questions that dominate this action.

68. Plaintiff's claims are typical of the claims of the Class. Plaintiff, like all proposed members of the Class, had his PII/PHI compromised in the Data Breach.

Plaintiff and Class members were injured by the same wrongful acts, practices, and omissions committed by Defendants, as described herein. Plaintiff's claims therefore arise from the same practices or course of conduct that give rise to the claims of all Class members.

69.     Plaintiff will fairly and adequately protect the interests of the Class members. Plaintiff is an adequate representative of the Class in that Plaintiff has no interests adverse to, or that conflict with, the Class he seeks to represent. Plaintiff has retained counsel with substantial experience and success in the prosecution of complex consumer protection class actions of this nature.

70.     A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages and other financial detriment suffered by Plaintiff and Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for Class members to individually seek redress from Defendants' wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action

device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

## COUNT I

## NEGLIGENCE

71.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

72.    Defendants owed a duty to Plaintiff and Class members to exercise reasonable care in safeguarding and protecting their PII/PHI in its possession, custody, or control.

73.    Defendants knew the risks of collecting and storing Plaintiff's and Class members' PII/PHI and the importance of maintaining secure systems. Defendants knew of the many data breaches that targeted businesses that collect sensitive PII/PHI in recent years.

74.    Given the nature of Defendants' business, the sensitivity and value of the PII/PHI it maintains, and the resources at its disposal, Defendants should have identified the vulnerabilities to their systems and prevented the Data Breach from occurring.

75.    Defendants breached these duties by failing to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII/PHI by failing to

design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect PII/PHI entrusted to it—including Plaintiff's and Class members' PII/PHI.

76.     It was reasonably foreseeable to Defendants that  failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII/PHI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems would result in the unauthorized release, disclosure, and dissemination of Plaintiff's and Class members' PII/PHI to unauthorized individuals.

77.     But for Defendants' negligent conduct or breach of the above-described duties owed to Plaintiff and Class members, their PII/PHI would not have been compromised.

78.     Defendants' duties also arise from, *inter alia*, the HIPAA Privacy Rule ("Standards for Privacy of Individually Identifiable Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and E, and the HIPAA Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C (collectively, "HIPAA Privacy and Security Rules").

79.     Defendants' duties also arise from Section 5 of the FTC Act ("FTCA"), 15 U.S.C. § 45(a)(1), which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted by the FTC, the unfair act or practice by business, such as Defendants, of failing to employ reasonable measures to protect and secure PII/PHI.

80.     Defendants violated Section 5 of the FTCA by failing to use reasonable measures to protect Plaintiff's and Class members' PII/PHI and not complying with applicable industry standards. Defendants' conduct was particularly unreasonable given the nature and amount of PII/PHI it obtains and stores, and the foreseeable consequences of a data breach involving PII/PHI including, specifically, the substantial damages that would result to Plaintiff and the other Class members.

81.     In addition, MCL § 550.1406, otherwise known as The Nonprofit Health Care Corporation Reform Act of 1980, requires that all medical facilities, such as those operated by Defendants, "ensure the confidentiality of records containing personal data that may be associated with identifiable members, use reasonable care to secure these records from unauthorized access." MCL § 550.1406(1).

82.     Defendants violated HIPAA Privacy and Security Rules and Section 5 of the FTCA by failing to use reasonable measures to protect Plaintiff's and all other Class members' PII/PHI and not complying with applicable industry standards.

Defendants' conduct was particularly unreasonable given the nature and amount of PII/PHI it obtains and stores, and the foreseeable consequences of a data breach involving PII/PHI including, specifically, the substantial damages that would result to Plaintiff and the other Class members.

83.    In addition to its negligence, Defendants' violation of HIPAA Privacy and Security Rules and Section 5 of the FTCA constitutes negligence per se.

84.    Plaintiff and Class members are within the class of persons that HIPAA Privacy and Security Rules and Section 5 of the FTCA were intended to protect.

85.    The harm occurring as a result of the Data Breach is the type of harm HIPAA Privacy and Security Rules and Section 5 of the FTCA were intended to guard against. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair practices or deceptive practices, caused the same type of harm that has been suffered by Plaintiff and all other Class members as a result of the Data Breach.

86.    It was reasonably foreseeable to Defendants that their failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII/PHI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems, would result in the

release, disclosure, and dissemination of Plaintiff's and Class members' PII/PHI to unauthorized individuals.

87.    As a result of Defendants' above-described wrongful actions, inaction, and want of ordinary care, and its negligence and negligence per se, that directly and proximately caused the Data Breach, Plaintiff and Class members have suffered, and will continue to suffer, economic damages and other injury and actual harm in the form of, *inter alia*: (i) a substantially increased risk of identity theft and medical theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure, publication, and theft of their PII/PHI; (iii) breach of the confidentiality of their PII/PHI; (iv) deprivation of the value of their PII/PHI, for which there is a well-established national and international market; (v) the continued risk to their PII/PHI which remains in Defendants' possession; and (vi) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of medical identity theft they face and will continue to face.  In addition, Class members already have suffered actual fraud, identity theft, and medical theft as alleged herein, demonstrating how imminent the threat of such fraudulent activity and damages are to all Class members.

## COUNT II

### BREACH OF FIDUCIARY DUTY

88.   Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

89.   Plaintiff and Class members provided Defendants their PII/PHI in confidence, believing that Defendants would protect that information. Plaintiff and Class members would not have provided Defendants with this information had they known it would not be adequately protected. Defendants' acceptance and storage of Plaintiff's and Class members' PII/PHI created a fiduciary relationship between Defendants, on the one hand, and Plaintiff and Class members, on the other hand. In light of this relationship, Defendants must act primarily for the benefit of their patients and clients, which includes safeguarding and protecting Plaintiff's and Class members' PII/PHI.

90.   Defendants have a fiduciary duty to act for the benefit of Plaintiff and Class members upon matters within the scope of their relationship. Defendants breached that duty by failing to properly protect the integrity of their systems containing Plaintiff's and Class members' PII/PHI, failing to comply with the data security guidelines set forth by HIPAA, and otherwise failing to safeguard Plaintiff's and Class members' PII/PHI that they collected.

91. As a direct and proximate result of Defendants' breaches of their fiduciary duties, Plaintiff and Class members have suffered and will suffer injury, including, but not limited to: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, publication, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with efforts attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI which remains in Defendants' possession; and (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach. In addition, upon information and belief, Class members already have suffered actual fraud, identity theft, and medical theft, demonstrating how imminent the threat of such fraudulent activity and damages are to all Class members.

## COUNT III

### BREACH OF IMPLIED CONTRACT

92. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

93. In connection with receiving medical treatment, services, and/or participation in a health plan Plaintiff and Class members entered into implied contracts with Defendants.

94.     Pursuant to these implied contracts, Plaintiff and Class members provided Defendants with their PII/PHI. In exchange, Defendants agreed to, among other things, and Plaintiff understood that Defendants would: (1) provide medical, surgical, and cosmetic services to Plaintiff and Class members; (2) take reasonable measures to protect the security and confidentiality of Plaintiff's and Class members' PII/PHI; and (3) protect Plaintiff's and Class members' PII/PHI in compliance with federal and state laws and regulations and industry standards.

95.     The protection of PII/PHI was a material term of the implied contracts between Plaintiff and Class members, on the one hand, and Defendants, on the other hand. Indeed, as set forth *supra*, Defendants recognized the importance of data security and the privacy of its patients' PII/PHI in, *inter alia*, its HIPAA Notice of Privacy Practices. Had Plaintiff and Class members known that Defendants would not adequately protect their patients' and clients' PII/PHI, they would not have participated in the health plan or received medical treatment or services from Defendants.

96.     Plaintiff and Class members performed their obligations under the implied contract when they provided Defendants with their PII/PHI and paid—directly or through their insurers—for medical, surgical, and cosmetic services from Defendants.

97.     Defendants breached its obligations under its implied contracts with Plaintiff and Class members in failing to implement and maintain reasonable security measures to protect and secure their PII/PHI and in failing to implement and maintain security protocols and procedures to protect Plaintiff's and Class members' PII/PHI in a manner that complies with applicable laws, regulations, and industry standards.

98.     Defendants' breach of its obligations of its implied contracts with Plaintiff and Class members directly resulted in the Data Breach and the injuries that Plaintiff and Class members have suffered from the Data Breach.

99.     Plaintiff and Class members were damaged by Defendants' breach of implied contracts because: (i) they paid—directly or through their insurers—for data security protection they did not receive; (ii) they face a substantially increased risk of identity theft and medical theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (iii) their PII/PHI was improperly disclosed to unauthorized individuals; (iv) the confidentiality of their PII/PHI has been breached; (v) they were deprived of the value of their PII/PHI, for which there is a well-established national and international market; and (vi) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of medical identity theft they face and will continue to face.

## COUNT IV

## UNJUST ENRICHMENT

100.   Plaintiff realleges and incorporate by reference all preceding paragraphs as if fully set forth herein.

101.   This claim is pleaded in the alternative to the breach of implied contract claim.

102.   Plaintiff and Class members conferred a monetary benefit upon Defendants in the form of monies paid for medical, surgical, and cosmetic services.

103.   Defendants accepted or had knowledge of the benefits conferred upon it by Plaintiff and Class members. Defendants also benefitted from the receipt of Plaintiff's and Class members' PII/PHI, as this information was used facilitate payment and make insurance claims.

104.   As a result of Defendants' conduct, Plaintiff and Class members suffered actual damages in an amount equal to the difference in value between their payments made with reasonable data privacy and security practices and procedures that Plaintiff and Class members paid for, and those payments without reasonable data privacy and security practices and procedures that they received.

105.   Defendants should not be permitted to retain the money belonging to Plaintiff and Class members because Defendants failed to adequately implement the data privacy and security procedures for itself that Plaintiff and Class members paid

for and that were otherwise mandated by federal, state, and local laws and industry standards.

106.    Defendants should be compelled to provide for the benefit of Plaintiff and Class members all unlawful proceeds received by them as a result of their conduct and Data Breach alleged herein.

## COUNT V

### VIOLATIONS OF THE MICHIGAN CONSUMER PROTECTION ACT
### Mich. Comp. Laws §§ 455.901 *et seq*. ("MCPA")

107.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

108.    Plaintiff and Defendants are "persons" under the MCPA. MCL § 455.902(d).

109.    Defendants' transactions and conducting of business, namely providing medical, surgical, and cosmetic services is "trade or commerce" under the MCPA. MCL § 455.902(g).

110.    The MCPA lists 38 categories of practices that are considered unfair, unconscionable, or deceptive, and thus unlawful, under the statute. MCL § 455.903. Defendants' conduct in providing medical, surgical, services, and/or participation in a health plan to Plaintiff and Class members while omitting or concealing that its data privacy practices are inadequate and that the sensitive information entrusted to

it was exposed to a breach, constitutes unfair, unconscionable, deceptive, and thus unlawful, practices in at least the following categories:

    a.    "Representing that . . . services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have . . ." MCL § 455.903(c);

    b.    "Representing that . . . services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another" MCL § 455.903(e);

    c.    "Failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer" MCL § 455.903(s); and

    d.    "Failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner" MCL § 455.903(cc).

111. Had Plaintiff and Class members been aware of the omitted and misrepresented facts, i.e., that Defendants do not value data privacy and does not protect sensitive information, Plaintiff and the other Class members would not have sought services from Defendants.

112. Pursuant to MCL § 455.911(4), Plaintiff seeks damages on behalf of himself and Michigan Class members.

## COUNT VI

### VIOLATIONS OF MICHIGAN'S DATA BREACH NOTIFICATION
### STATUTE
### Mich. Comp. Laws §§ 445.71 *et seq*.

113. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

114. Plaintiff is authorized to bring this claim under MCL § 445.73(13).

115. Defendants own, maintain, and record PII and PHI, and computerized data including PII and PHI, about its current and former patients, clients, and other affiliated persons, including Plaintiff and Class members.

116. Defendants are in possession of PII and PHI belonging to Plaintiff and Class members and is responsible for reasonably safeguarding that PII and PHI consistent with the requirements of MCL § 445.72.

117. Defendants failed to safeguard, maintain, and dispose of, as required, the PII/PHI within their possession, custody, or control, which it was required to do by Michigan law.

118. Defendants knowingly and/or reasonably believing that Plaintiff's and Class members' PII and PHI was acquired by unauthorized persons during the Data Breach, failed to provide reasonable and timely notice of the Data Breach to Plaintiff and Class members, as required by MCL § 445.72(1), (4).

41

119.    As a result of Defendants' failure to reasonably safeguard Plaintiff's and Class members' PII/PHI, and the failure to provide reasonable and timely notice of the Data Breach to Plaintiff and Class members, Plaintiff and the Class have been damaged as described herein, continue to suffer injuries as detailed above, are subject to the continued risk of exposure of their PII/PHI in Defendants' possession, and are entitled to damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

Plaintiff, individually and on behalf of all other members of the Class, respectfully requests that the Court enter judgment in his favor and against Defendants as follows:

A.      Certifying the Class as requested herein, designating Plaintiff as Class representative, and appointing Plaintiff's counsel as Class Counsel;

B.      Awarding Plaintiff and the Class appropriate monetary relief, including actual damages, statutory damages, punitive damages, restitution, and disgorgement;

C.      Awarding Plaintiff and the Class equitable, injunctive, and declaratory relief, as may be appropriate. Plaintiff, on behalf of themselves and the Class, seeks appropriate injunctive relief designed to prevent Defendants from experiencing another data breach by adopting and implementing best data security practices to safeguard PII/PHI and to provide or extend credit monitoring services and similar services to protect against all types of identity theft and medical identity theft;

D.     Awarding Plaintiff and the Class pre-judgment and post-judgment interest to the maximum extent allowable;

E.     Awarding Plaintiff and the Class reasonable attorneys' fees, costs, and expenses, as allowable; and

F.     Awarding Plaintiff and the Class such other favorable relief as allowable under law.

### JURY TRIAL DEMANDED

Plaintiff demands a trial by jury of all claims in this Class Action Complaint so triable.


Dated: December 15, 2025               */s/ Andrew W. Ferich*
                                       Andrew W. Ferich
                                       **AHDOOT & WOLFSON, PC**
                                       201 King of Prussia Road, Suite 650
                                       Radnor, Pennsylvania 19087
                                       aferich@ahdootwolfson.com

                                       Bradley K. King
                                       **AHDOOT & WOLFSON, PC**
                                       521 Fifth Avenue, 17th Floor
                                       New York, New York 10175
                                       Telephone: (917) 336-0171
                                       Facsimile: (917) 336-0177
                                       bking@ahdootwolfson.com

                                       Tina Wolfson (*pro hac vice*
                                       forthcoming)
                                       **AHDOOT & WOLFSON, PC**
                                       2600 W. Olive Ave., Suite 500
                                       Burbank, CA 91505-4521
                                       Telephone: (310) 474-9111

Facsimile: (310) 474-8585
twolfson@ahdootwolfson.com